## IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF GEORGIA
## ATLANTA DIVISION

|  |  |
|---|---|
| **SECURITIES AND EXCHANGE COMMISSION,** | : |
| | : |
| | : |
| | : |
| **Plaintiff,** | : **Civil Action No.** 1:14-CV-3030-RWS |
| **v.** | : |
| | : |
| | : |
| **ZHUNRIZE, INC., and** | : |
| **JEFF PAN,** | : |
| | : |
| **Defendants.** | : |
| | : |

## COMPLAINT FOR INJUNCTIVE AND OTHER RELIEF

Plaintiff, Securities and Exchange Commission ("Commission"), files its complaint and alleges that:

## OVERVIEW

1. This case concerns an ongoing fraudulent scheme operated by Zhunrize, Inc. ("Zhunrize"), an Atlanta-based multilevel marketing company, and Jeff Pan ("Pan"), Zhunrize's CEO that has raised over $100 million from investors worldwide.

2. Zhunrize purports to be a legitimate multi-level marketing business by which members purchase online stores and then sell merchandise through them,

while earning commissions on products purchased by their customers and through store sales to other members and hosting fees paid by those members.

3.      In fact, the company is operating as a pyramid scheme because it depends on the continual recruitment of new members to generate the returns it pays its members.  The company offers compensation plans to investors that are based on recruitment, with the most lucrative returns based on recruitment by subsequent members in a member's downline.  The company earns virtually no profit from product sales.  A majority of the "stores" (online websites which are what members purchase) sold by the company cannot sell product.

4.      From 2012 to the present, the company has taken in approximately $105 million from investors who have purchased approximately 77,000 stores.

5.      In its promotional materials, Zhunrize touts the ability to earn commissions from the sale of products, both through the owner's store and through downstream owners' stores.  For example, a Zhunrize promotional video differentiates Zhunrize from other on-line multi-level marketing plans, claiming that the Zhunrize model has "sustainability."

6.      According to the video, "the Zhunrize model will sustain itself because we will have millions more customers than distributors."  Later, the moderator in the

video claims "we have the Vendor Relationships, the Logistics, the Payment Gateways to reach millions of new customers each month."

7.      Zhunrize does not disclose, however, that to date substantially all of its revenue (more than 98%) has comes from the sale of memberships (referred to as stores) and the corresponding monthly internet hosting fees associated with operating those stores, rather than the sale of products.

8.      Further, the product sales that do take place are, overall, not profitable.  The lucrative returns paid to investors come from fees paid by other investors.

9.      Promotional literature used by Zhunrize also tout the lucrative profits that can be earned from the recruitment of additional members, even suggesting that members can make a return of over 800%.

10.     Thus, contrary to the representations to potential investors, Zhunrize is actually a fraudulent pyramid scheme.

## **VIOLATIONS**

11.     Defendants have engaged and, unless restrained and enjoined by this Court, will continue to engage in acts and practices that constitute and will constitute violations of Sections 5(a), (c) and 17(a) of the Securities Act of 1933 ("Securities Act") [15 U.S.C. §§77e(a), 77e(c) and 77q(a)] and Sections 10(b) of the Securities

Exchange Act of 1934 ("Exchange Act") [15 U.S.C. §§ 78j(b)] and Rule 10b-5

thereunder [17 C.F.R. 240.10b-5].

## JURISDICTION AND VENUE

12.     The Commission brings this action pursuant to Sections 20 and 22 of the

Securities Act [15 U.S.C. §§ 77t and 77v] and Sections 21(d) and 21(e) of the

Exchange Act [15 U.S.C. §§ 78u(d) and 78u(e)] to enjoin Defendants from

engaging in the transactions, acts, practices, and courses of business alleged in this

complaint, and transactions, acts, practices, and courses of business of similar purport

and object, for civil penalties and for other equitable relief.

13.     This Court has jurisdiction over this action pursuant to Section 22 of the

Securities Act [15 U.S.C. § 77v] and Sections 21(d), 21(e), and 27 of the Exchange

Act [15 U.S.C. §§ 78u(d), 78u(e), and 78aa].

14.     Defendants, directly and indirectly, made use of the mails, the means and

instruments of transportation and communication in interstate commerce and the

means and instrumentalities of interstate commerce in connection with the

transactions, acts, practices, and courses of business alleged in this complaint and

made use of mail and means of instrumentality of interstate commerce to effect

transactions, or to induce or to attempt to induce the purchase or sale of securities alleged in this complaint.

15.     Certain of the transactions, acts, practices, and courses of business constituting violations of the Securities Act and the Exchange Act occurred in the Northern District of Georgia.  In addition, Pan resides in the Northern District of Georgia and directed the operations of Zhunrize from the Northern District of Georgia.

16.     Defendants, unless restrained and enjoined by this Court, will continue to engage in the transactions, acts, practices, and courses of business alleged in this complaint, and in transactions, acts, practices, and courses of business of similar purport and object.

## **THE DEFENDANTS**

17.     <u>Zhunrize</u> is a Georgia corporation founded in 2012 and located in Atlanta. The company purports to be in the business of selling online stores to its members that they can then use to sell merchandise to others.  Zhunrize has never registered an offering of securities under the Securities Act or a class of securities under the Exchange Act.

18.     Jeff Pan, age 52 and a resident of Suwanee, Georgia, is the CEO of

Zhunrize.

## THE FRAUDULENT SCHEME

### A.     Zhunrize's Organization and Operations

19.     Zhunrize is a multi-level marketing business that recruits its members

through word-of-mouth, its website, webinars and seminars conducted around the

country by Pan and others.

20.     Defendants solicit investors through webinars and in-person presentations.

Defendants have conducted seminars in most of the major cities in the United

States.  Pan also has traveled to China and Korea to solicit investors.

21.     Much of Defendants' solicitations come through on-line webinars and

videos released through You-Tube.  These videos include references to written

documentation, including the commission structures and charts referenced in the

Complaint.

22.     Zhunrize's purported business plan is to marry online shopping with social

media in hopes of acquiring 500 million customers and $10 billion in sales by

2020.  Zhunrize offers a "turnkey" opportunity for individuals by providing

individuals with a personal website containing an online savings store ("OSS")

through which the investor can "earn income in several ways."

23.    In keeping with its representations to act as a "turnkey" business, Zhunrize

performs the key managerial functions and provides extensive assistance to store

owners.

24.    The company chooses the types of products and services that are offered in

the stores, and the company negotiates the prices for those products.  The company

also provides increased levels of marketing support, mostly in the forms of ready-

made e-mails and e-mail campaigns, for higher levels of membership.

25.    Zhunrize maintains a separate website known as Zhuncity.com, which

functions as a portal for all of the online stores of Zhunrize's members.  If a

product purchase is made, a third-party provider receives the order through the

Zhunrize website and ships the merchandise from its facilities to the customer.

Zhunrize handles all customer service issues, such as the preparation of invoices,

and if a customer returns an item to the third-party provider Zhunrize refunds the

amount paid for the merchandise.  Zhunrize also administers the complex

compensation formula that distributes "profts" through the membership.

26.     Zhunrize further claims that it uses unique analytics, which it calls "geo-fencing," to drive customer traffic to the Zhunrize member's on-line store.

27.     There are five options for joining Zhunrize.

28.     Under the first option, an investor is not required to buy an online savings store ("OSS").  Instead, the investor becomes an Independent Customer Representative ("ICR"), and for the cost of $20 a month, the investor can receive commissions for referring others to become a Zhunrize ICR or for purchasing an OSS from the investor.

29.     The amount of those commissions to an ICR member, however, is limited. Although the marketing literature states that an ICR is eligible for commissions from product sales, it is unclear how such product sales would be tracked given that the ICR has no OSS through which to process such sales.

30.     The remaining four membership options require the investor to purchase an OSS.  These OSSs are offered at varying levels of fees, merchandise offered and commission structure.

31.     An investor who joins Zhunrize by purchasing an "ECR" OSS pays a $99 membership fee and a $30 monthly internet "hosting fee."  According to

Zhunrize's marketing materials, an ECR investor begins at the minimal compensation level.

32.     The next level of OSS is Basic, which requires a $495 membership fee and a $50 monthly "hosting fee."

33.     The Pro level requires a $1,500 membership fee and a $70 monthly "hosting fee."

34.     Finally the Premier level requires a $3,000 membership fee and $100 monthly "hosting fee."  Only Premier level investors are eligible for Zhunrize's full compensation structure.

35.     Once a member purchases an OSS, the member receives a personal website containing his online store, which is basically a duplication of Zhunrize's own website, Zhuncity.com.  The member can then direct others to his store to purchase items.

36.     The Zhuncity.com website functions as a portal for all of the online stores of Zhunrize's members.  If a purchase is made through a member's personal store, a third-party provider receives the order through the Zhuncity.com website and ships the merchandise from its facilities to the customer.

37.     Seventy percent of Zhunrize's members are at the Basic OSS level, while twenty percent are at the Pro OSS level and the remaining ten percent are at the Premier OSS level.  Zhunrize has approximately 77,000 stores at present.

38.     Zhunrize's business model purports to be premised on the idea that it can obtain desirable products at lower prices than its competitors, like Amazon, eBay and Walmart.  Yet, the products currently available on the Zhuncity website are not the type of products that are likely to generate a high demand.

39.     Moreover, in order to undercut its competitors' pricing, Zhunrize will necessarily have significantly smaller profit margins.  In fact, Pan has admitted that Zhunrize loses money on some of the products they sell.

### B.     Zhunrize's Compensation Structure Is Predicated Largely on the Recruitment of New Investors

40.     Zhunrize's website and other promotional materials identify several avenues by which members can generate returns.

41.     Because the vast majority of Zhunrize's revenue (and virtually all of the profits distributed to members) comes from store sales and monthly internet hosting fees, the amounts paid for product sales commissions are largely irrelevant.

Nevertheless, Zhunrize purports to pay 50% of the profit from each product sale to the investor.

42.     The remaining benefits paid by Zhunrize fall into five other categories.  The most lucrative potential returns come from the recruitment of additional members.

       *a.     The Generation Sales Override*

43.     The Generation Sales Override program provides compensation based on the recruitment of new members (primarily recruitment by others than the member), and does not depend on the sale of any product.

44.     A chart created by Zhunrize and used during webinars for potential investors, illustrates the potentially lucrative profits flowing from the recruitment of downstream members.

45.     According to the chart, a premier member that recruits three ECR members will receive 15% of the $99 paid by each new member (a total of $45).  If the three first generation members each recruit 3 new ECR members, the premier member will receive 10% of the $99 paid by the nine second generation members (a total of $89).  If this recruitment rate continues through the 10th generation (*i.e.* each new member recruits three additional members), the chart shows that the initial premier member would earn approximately $263,000 from the sale of the approximately

88,500 downstream ECR memberships.  This represents a return of approximately

8,666% on the premier member's $3,000 initial investment.   The chart also shows

that the premier member would earn an additional $900,000 from the hosting fees

paid by the downstream members.

46.     According to another chart, if the downstream investors purchase the

"Basic" level ($495) rather than the "ECR" level, the returns to the premier

member from the sale of 10 generations jumps to $1.3 million (a return of

43,233%) and the internet hosting fees grows to just over $1 million.

47.      Both charts also show potentially significant amounts of revenue that could

be generated from product sales by the downstream members, but neither chart

identifies what percentage or amount, if any, would be paid to the premier

member.

       *b.     The Monthly 2x5 Matrix*

48.     The Monthly 2x5 Matrix compensation program also offers compensation

connected with the sale of new stores and does not depend on the sale of any

products.

49.     Under this program, members can receive commissions based on the internet

hosting fees paid by new members they recruit, and their downstream recruits.

50.     The initial member can sponsor at least two, or up to five additional members and then earn amounts ranging from $.40 to $2.50 per member on members five levels down from the members sponsored initially, depending on the membership level of the initial member and those in his matrix.

51.     In a chart drafted by Pan and used in marketing videos, the matrix can expand to eighteen levels including 524,286 members, based on which the initial member can earn $314,572 in monthly fees, which comes from the hosting fees paid by downstream members.

        c.      *The Daily Bonus Pool*

52.     A new member becomes eligible for the daily bonus pool by selling (or buying) at least one product worth $30 in the first month.  He can then participate in the daily pool for however many days are remaining in the month of the sale and the following month.

53.     Because Zhunrize does not ship products outside the United States, the product sales requirement is waived for international members.  Zhunrize has close to 40,000 stores in Korea and 1,000 stores in China.

54.     To calculate the amount available for the daily bonus pool, Zhunrize takes 20% of the net profit on that particular day's product sales and 20% of the gross

amount for the stores sold and hosting fees collected that day and allocates that amount on a pro rata basis to all eligible investors.

55.    The fact that members can participate in this pool with only one minimal product sales and the fact that the product sale requirement is waived for foreign investors demonstrates that the focus of Zhunrize's commission structure is store sales and hosting fees.

          d.    *The Monthly Bonus Pool*

56.    The importance of recruiting new members into the Zhunrize scheme is highlighted by the requirements for eligibility to join in the monthly bonus pool.

57.    To join the monthly pool, a member must recruit three new members within thirty days or five new members within an unlimited time.  Although there is a product sale component to eligibility, it is negligible.

58.    Zhunrize places 15% of its net profit on a particular month's product sales with 15% of the gross amount for the stores sold and hosting fees collected that month into this bonus pool to be paid to eligible members on the 15th of each succeeding month.  Again this amount is allocated to members on a pro rata basis.

59.    Investors have the option of having their commissions paid to them or converting their commissions into points.  The more points an investor has the

14

higher the pro rata portion of the bonus pool that investor will receive.  Once an

investor has chosen to convert his commissions into points, the investor is

permitted to request that those points revert to cash, but only 20% of those points

can be redeemed as cash each month.

      e.     *The Daily Leadership Matching Bonus*

60.    Finally, the Daily Leadership Matching Bonus is paid to premier level

members who recruit three members after these members recruit three members

each, provided that some of the new members are also at the premier level.

61.    Again the focus of this commission structure is the recruitment of new

members, and there is not product sale requirement for eligibility.

62.    The commissions paid consist of ten percent of the store sales and product

sales, but not hosting fees, of the stores in the premier member's downline.

    **C.**    **Zhunrize's Revenues Flow Predominantly from the Recruitment
of New Investors Rather than the Sale of Products**

63.    The vast majority of Zhunrize's business activity is associated with non-

product revenue.

64.    In fact, during two years of Zhunrize's operations, beginning in July 2012 through late July 2014, virtually none of the $105 million in revenue received by Zhunrize was derived from product sales.

65.    Zhunrize received a total of approximately $105.07 million in revenue from all sources during this period.

66.    Of this, Zhunrize earned $103.66 million, or 98.66% of its revenue, from membership sales, the initial monthly hosting fee paid by a new member in connection with the purchase of a store, and the membership fee and initial hosting fee associated with an existing member's purchase of an upgraded membership.

67.    The amount of revenue earned from merchandise sales, which is calculated as the total amount of revenue less that earned from membership and initial hosting fees ($105.07 million minus $103.66 million), was only $1.41 million, or 1.34% of the total revenue received during the same period.

68.    These revenue figures do not include the subsequent monthly hosting fees. If they were included, revenue from merchandise sales would be even a smaller percentage of total revenues.

69.    Zhunrize has admitted that in 2014, the company has paid $340,000 in commissions to its members based on product sales and almost $51 million in

commissions based on the sale of new stores (*i.e.* new memberships) and the hosting fees associated with those stores.

70.     Both Pan and a Zhunrize vice-president admitted that the company currently derives 80-90% of its revenue from selling online stores and collecting the monthly internet hosting fees associated with those stores, as opposed to the sale of actual products from the stores.

71.     Moreover, the actual profits that Zhunrize makes on its product sales are negligible.

72.     The results of Zhunrize's operations on March 5, 2014 provide a clear example Zhunrize's typical revenue stream as they show the following:  1) Zhunrize made only a small percentage of its revenue from product sales; 2) Zhunrize lost money on the minimal amount of products it did sell when commissions and profit sharing pool contributions were included; and 3) the commissions Zhunrize became obligated to pay, both directly and through bonus pools, were overwhelmingly derived from non-product sales.

73.     On March 5, 2014, Zhunrize earned total revenue of $235,344.  Of this total, sales of new stores were $220,392 or 93.65%, hosting fees were $11,745 or 4.99%, and product sales were $3,207 or 1.36%.  Zhunrize therefore received $232,137, or

98.64%, of its revenue on March 5 from the sale of either online stores or hosting fees, with only 1.36% coming from the sale of actual products.

74.     Furthermore, the product sales were not profitable.  Zhunrize received $3,207 in revenue for these products, collected $71 in sales taxes and recorded $2,909 in costs of goods sold, leaving a net profit of $227.

75.     Zhunrize, however, must pay commissions to its members for goods sold through their stores and make payments to its profit sharing pools.

76.     Zhunrize represents that it pays 50% of the net profits from product sales in commissions.  Of the remaining 50%, Zhunrize represents that it apportions 20% for the daily bonus pool, 15% for the monthly bonus pool, and some additional portion for generation sales overrides and the daily leadership matching bonus.

77.     On March 5, 2014, Zhunrize paid $737 in commissions on the sales and contributions to the profit sharing pools, resulting in a loss on the goods sold on that date of $510.

78.     To put the revenue sources in perspective, on March 5, Zhunrize also became obligated to pay $160,635 in commissions and pool contributions, virtually all funded by membership and hosting fees.

79.    The company became obligated on March 5th to pay a total of $99,591 in direct commissions, including $93,947 in commissions paid on sales of stores (essentially membership fees) or 94.33%, $5,110 in commissions paid on internet hosting fees or 5.13%, and $534 paid on product sales or 0.54%.

80.    Of the total of $99,591 in total direct commissions, 99.46% were therefore tied to the sale of stores and internet hosting fees while only 0.54% came from product sales.

81.    The same pattern is present when the delayed liabilities for the $13,957 for the leadership bonus pool and $47,087 for the profit sharing pools are added to the figure for the direct commissions that became payable on March 5th.

## D.    Zhunrize is a Fraudulent Pyramid Scheme.

82.    Zhunrize represents itself to be a retail products sales organization.

83.    For example, in a July 2014 webinar, Pan projected $90 million per month in product sales by December 2014.  There is no basis for this projection given the company's past performance.

84.    The maximum product sales in any month appear to be approximately $100,000.

85.    Moreover, an on-line Zhunrize promotional video claims that it is different from other multi-level marketing plans, in that Zhunrize has "sustainability."

86.    Specifically, the video states:

> Sustainability comes from having more customers than distributors.   That creates sustainability.   Until now, profit sharing companies have struggled to do that.  Well, welcome to Zhunrize . . . .This model will sustain itself because we will have millions of more customers than distributors . . . .

87.    Later, the moderator in the video claims "we have the Vendor Relationships, the Logistics, the Payment Gateways to reach millions of new customers each month."

88.    Zhunrize does not disclose that, contrary to these representations, Zhunrize has historically generated substantially all of its revenue from the sale of new memberships rather than the sale of products.

89.    Zhunrize compensates its members from the sale of new memberships and the subsequent sale of downstream memberships, and the hosting fees paid by those members.  Zhunrize offers potentially lucrative returns from the sale of new memberships, regardless of any product sales.

90.    Also, virtually all of the company's revenues come from signup fee and monthly internet hosting fees, and the vast majority of the "commissions" paid to

members are based on such fees collected by the company and from a member's
downline.

91.    Defendants have misled investors by representing that the income stream
available to investors is generated by product sales, when in reality, product sales
make up a minimal portion of Zhunrize's overall revenues.

92.    The statements about sustainability and the comparison to other profit
sharing companies imply that Zhunrize is a legitimate multi-level marketing
program rather than a pyramid scheme.  This is false because Zhunrize operates as
a pyramid scheme.

93.    Defendants have failed to disclose that the vast majority of commissions
paid to investors are based on store sales and hosting fees.

94.    Moreover, Defendants have failed to disclose to investors that product sales
do not generate sufficient revenues to cover the product costs, plus the
commissions associated with those products sales.

95.    Zhunrize touts the potentially lucrative profits to be earned through the sale
of new memberships, including a chart showing that a premier member can earn a
43,333% return by recruiting three new basic members, if that recruitment rate
continues through the tenth generation.  These representations of exorbitant

returns, absent any disclosure of the pyramid nature of the Zhunrize program, are also misleading.

96.    Defendants further their fraudulent scheme by representing to investors that Zhunrize has "worldwide sales" without disclosing to investors that it cannot ship products outside the United States.

97.    To the extent that Zhunrize has "worldwide sales," it is the result of stores sales to foreign investors, and Zhunrize waives all product sales requirements for foreign investors.

98.    Of Zhunrize's 77,000 OSSs, Zhunrize currently has close to 40,000 OSSs in Korea and 1,000 OSSs in China.

99.    Such misrepresentations further Defendants' scheme to defraud investors into believing that Zhunrize has robust product sales when in fact such sales are largely irrelevant to the commissions paid to members.

## COUNT I—FRAUD

### Violations of Section 17(a)(1) of the Securities Act
### [15 U.S.C. § 77q(a)(1)]

100.   Paragraphs 1 through 99 are hereby re-alleged and are incorporated herein by reference.

101.   From at least 2012 to the present, Defendants, in the offer and sale of the securities described herein, by the use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly, employed devices, schemes and artifices to defraud purchasers of such securities, all as more particularly described above.

102.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud.

103.   While engaging in the course of conduct described above, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

104.   By reason of the foregoing, the defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 17(a)(1) of the Securities Act [15 U.S.C. § 77q(a)(1)].

## COUNT II—FRAUD

### Violations of Sections 17(a)(2) and 17(a)(3) of the Securities Act
### [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)]

105.   Paragraphs 1 through 99 are hereby realleged and are incorporated herein by reference.

23

106.   From at least 2012 to the present, Defendants, in the offer and sale of the securities described herein, by use of means and instruments of transportation and communication in interstate commerce and by use of the mails, directly and indirectly:

a.   obtained money and property by means of untrue statements of material fact and omissions to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

b.   engaged in transactions, practices and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

107.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Sections 17(a)(2) and 17(a)(3) of the Securities Act [15 U.S.C. §§ 77q(a)(2) and 77q(a)(3)].

### COUNT III—FRAUD

**Violations of Section 10(b) of the Exchange Act
[15 U.S.C. § 78j(b)]and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5]**

108.   Paragraphs 1 through 99 are hereby re-alleged and are incorporated herein by reference.

109.   From at least 2012 to the present, Defendants, in connection with the purchase and sale of securities described herein, by the use of the means and instrumentalities of interstate commerce and by use of the mails, directly and indirectly:

    a.     employed devices, schemes, and artifices to defraud;

    b.     made untrue statements of material facts and omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and

    c.     engaged in acts, practices, and courses of business which would and did operate as a fraud and deceit upon the purchasers of such securities,

all as more particularly described above.

110.   Defendants knowingly, intentionally, and/or recklessly engaged in the aforementioned devices, schemes and artifices to defraud, made untrue statements

of material facts and omitted to state material facts, and engaged in fraudulent acts, practices and courses of business.  In engaging in such conduct, Defendants acted with scienter, that is, with an intent to deceive, manipulate or defraud or with a severe reckless disregard for the truth.

111.   By reason of the foregoing, Defendants, directly and indirectly, have violated and, unless enjoined, will continue to violate Section 10(b) of the Exchange Act [15 U.S.C. § 78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

## COUNT IV—UNREGISTERED OFFERING OF SECURITIES

### Violations of Sections 5(a) and 5(c) of the Securities Act
### [15 U.S.C. § 77e(a) and 77e(c)]

112.   Paragraphs 1 through 99 are hereby realleged and are incorporated herein by reference.

113.   No registration statement has been filed or is in effect with the Commission pursuant to the Securities Act and no exemption from registration exists with respect to the transactions described herein.

114.   From at least 2012 to the present, Defendants, singly and in concert, have:

     (a)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to sell securities, through the use or medium of a prospectus or otherwise;

     (b)     carried securities or caused such securities to be carried through the mails or in interstate commerce, by any means or instruments of transportation, for the purpose of sale or for delivery after sale; and

     (c)     made use of the means or instruments of transportation or communication in interstate commerce or of the mails to offer to sell or offer to buy securities, through the use or medium of any prospectus or otherwise,

without a registration statement having been filed with the Commission as to such securities.

115.   By reason of the foregoing, Defendants, directly and indirectly, singly and in concert, have violated Sections 5(a) and 5(c) of the Securities Act [15 U.S.C. §§ 77e(a) and 77e(c)].

## **PRAYER FOR RELIEF**

WHEREFORE, Plaintiff Commission respectfully prays for:

### **I.**

Findings of fact and conclusions of law pursuant to Rule 52 of the Federal Rules of Civil Procedure, finding that Defendants named herein committed the violations alleged herein.

### **II.**

A temporary restraining order, preliminary and permanent injunctions enjoining the defendants, their officers, agents, servants, employees, and attorneys from violating, directly or indirectly, Sections 5(a), 5(c) and 17(a) of the Securities Act [15 U.S.C. §§77e(a), 77e(c) and 77q(a)] and Section 10(b) of the Exchange Act [15 U.S.C. §§78j(b)] and Rule 10b-5 thereunder [17 C.F.R. § 240.10b-5].

### **III.**

An order freezing the assets of Defendants.

### **IV.**

An order requiring an accounting by of the use of proceeds of the fraudulent conduct described in this Complaint and the disgorgement by the defendants of all

28

ill-gotten gains or unjust enrichment with prejudgment interest, to effect the remedial purposes of the federal securities laws.

## V.

An order pursuant to Section 20(d) of the Securities Act [15 U.S.C. §77t(d)], Section 21(d)(3) of the Exchange Act [15 U.S.C. §78u(d)(3)] imposing civil penalties against defendants.

## VI.

An order expediting discovery in this proceeding and prohibiting defendants from destroying, altering or removing assets.

## VII.

Such other and further relief as this Court may deem just, equitable, and appropriate in connection with the enforcement of the federal securities laws and for the protection of investors.

Plaintiff requests a jury trial.

Dated: September 22, 2014

Respectfully submitted,

*/s/ Kristin B. Wilhelm*
Kristin B. Wilhelm
Senior Trial Counsel
Georgia Bar No. 759054
Tel: (404) 842-7655
Email: wilhelmk@sec.gov

M. Graham Loomis
Regional Trial Counsel
Georgia Bar No. 457868
Tel: (404) 842-7622

COUNSEL FOR PLAINTIFF
Securities and Exchange
Commission
3475 Lenox Road, N.E.
Suite 500
Atlanta, Georgia 30326-1232
Tel: (404) 842-7600
Fax: (404) 842-7666